UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
In re

       Peter and Kristen LaSota                     Case No. 05-70085 K

                                  Debtors
------------------------------------------------------------------


OPINION AND ORDER


       Almost all[1] Chapter 13 debtors in this Court are here trying to preserve something; their home, their car, their dignity, for themselves or for their loved ones.

       BAPCPA statutorily introduced the notion of Chapter 13 debtors who have been more "frugal" than other Chapter 13 debtors of comparable income. They are the "above median income" debtors who spend less than what Form 22C allows, and they thus have what we might call "discretionary" income (on a post-petition basis) that is in excess of their statutorily-defined "disposable" income.

       The question before the Court is whether those debtors must commit any of that "excess" to the payment of unsecured creditors under any of the applicable 11 U.S.C. § 1325 tests - - here the "good faith" test and the "projected" disposable income test. (The Chapter 7 test is not applicable here.)

       These Debtors have $1200 per month surplus income over and above what Form 22C determines is their "current disposable income." That surplus is seen only on Schedules I

---

[1] One exception consists of debtors who have filed Chapter 13 in order to catch up on alimony, maintenance or support obligations. Another exception would be a debtor who proposes full repayment to all creditors and needs Chapter 13 to accomplish that in a more orderly, and perhaps more comfortable, manner by spreading the repayment out over a five year duration.

and J. The Debtors wish to put that excess in the bank to build their future, while discharging 61% of their $16,000 in credit card debt.[2]

The Chapter 13 Trustee argues that "accumulation of wealth" is not the purpose of Chapter 13, and that the "'projected' disposable income" test and the "good faith" test, either independently or in combination, require a 100% plan.

For the reasons below, the post-BAPCPA law is in his favor, and the Court will defer to his recommendation as the "representative of the estate" under 11 U.S.C. §§ 323(a) and 1302.

An excellent exposition of the issues and the current cases addressing them is contained in the article, Kevin R. Anderson, *Disposable Income vs. Projected Disposable Income: Identical Twins or Distant Relatives*, Nat'l Assn' of Chap. 13 Trs. Q., Jul./Aug./Sept. 2006, at 12, and though the Court will presume familiarity with that article and with the cases that are thoroughly discussed in it, it is summarized here. Any errors in the analysis are mine, not Mr. Anderson's.[3]

---

[2] This is not quite the current posture. In fact, these Debtors have agreed to the confirmation of 100% payout plan for reasons somewhat unrelated to this decision, but need an answer to the question at Bar should their circumstances change over the next five years and a plan modification be necessary.

[3] Anderson notes that prior to BAPCPA, the calculation of projected disposable income required only the use of Schedules I and J. Anderson's review of past practice yields the observation that the term "projected" had not presented a unique problem of statutory construction for courts, because the earlier practice required information on income and expenses relevant to the effective date of the plan or, at least, to the time the debtor completed Schedules I and J. Most important for the purposes here is Anderson's observation that the accepted Chapter 13 practice in all districts allowed a debtor to accumulate savings during the plan period only if the debtor had proposed a 100% plan.

Under BAPCPA, "disposable income" is no longer defined solely from Schedules I and J. Now "disposable income" is found through completing Official Form B22C. A Anderson details, the new calculation of "disposable income" requires the application of, most notably, §§ 101(10A) ("current monthly income," or the average of debtor's income in the six months prior to the petition date), 707(b)(2)(A) and (B) ("means test," which

What lands a debtor in Chapter 13 is usually about the past.  But to this writer,

---

requires utilization of national and local standards), and 101(39A) ("standards" as issued by the Bureau of Census and the IRS indicating allowable expenses).

Anderson demonstrates how the side by side application of Form B22C and Schedules I and J can result in differing "disposable incomes."  The discrepancy can allow some post-BAPCPA debtors to both present an approvable plan paying less than 100% <u>and</u> to accumulate savings during the plan.  Anderson shows how the discrepancy results from the basing "disposable income" on pre-petition income adjusted by the expense standards flowing from the creation of the above-and-below-the-median income categories contrasted with the debtor's actual ability to pay.

Anderson chronicles how the result of the new exercise has been to elevate the term "projected" to an issue of construction, that is, whether "projected" now relates only to the "disposable income" which is delimited by "currently monthly income" and the "means test" - linked national and local standards for allowable expenses.  Or whether "projected" relates, as before, to ability to pay.  Anderson cites the following cases as emblematic of the issue.

First are the cases holding that the term "projected" can only logically be read to indicate the amount a debtor is able to commit from income received during the life of the plan; that is, "projected" is forward looking. *In re Hardacre*, 338 B.R. 718 (Bankr. N.D. Tex 2006) ("The court believes that the term 'projected disposable income' must be based upon the debtor's anticipated income during the term of the plan, not merely an average of her prepetition income.  This conclusion is buttress not only by the anomalous results that could occur by strictly adhering to section 101 (10A)'s definition of 'current monthly income,' but because, taken as a whole, section 1325(b)(1) commands such a construction."); *In re Jass*, 340 B.R. 411 (Bankr. C.D. Utah 2006) ("Thus, the Court concludes that the plan meaning of § 1325(b) is dispositive of this issue.  Under the clear meaning of the statute, a debtor must propose to pay unsecured creditors the number resulting from Form B22C, unless the debtor can show that this number does not adequately represent the debtor's budget projected into the future."); *In re Kibbe*, 342 B.R. 411 Bankr. D.N.H. 2006) (following *Hardacre* and *Jass* to resolve discrepancy between projected disposable income under Form B22C and Schedules I and J in favor of creditors).

The contrary view, that "projected" can only modify pre-petition average monthly income, is represented by the *In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C. 2006) holding that Form B22C controls, even if the resulting plan would fail under the pre-BAPCPA "good faith" test set forth in § 1325(a)(3) because the "new" income dedicated to the plan would differ markedly from the prior Schedules I and J calculation.  "While BAPCPA made significant changes to section 1325(b), nothing in those changes or elsewhere in BAPCPA suggests any legislative intent that any section of the Bankruptcy Code other than section 1325(b) should be controlling in dealing with a Chapter 13 debtor's ability to pay."  *Id.* At 184 (finding support in 8 Collier On Bankruptcy ¶ 1325.08[1] (15th ed. Rev. 2005)). *See also In re Guzman*, B.R. 640 (Bankr. E.D. Wis. 2006) (same result, endorsing *Barr*, In re *Alexander*, 344 B.R. 742 (Bankr. E.D.N.C. 2006) (same view of construction of § 1325(b) and 1325(a)(3) under BAPCPA).

The present writer observes that the issue of the meaning of "projected" within § 1325(b) arises only when an unsecured creditor or the trustee objects to the debtor's proposed Chapter 13 plan.  If the court were to deny the objection, the court would then turn to § 1325(a)(3) and apply the good faith test. Certainly then a plan that proposed to allow the debtor to accumulate savings while paying unsecured creditors less than 100% would face a good faith hurdle.

almost every Chapter 13 Plan that proposes less than full payment to creditors is about <u>future</u> choices, not <u>past</u> choices or misfortunes. And so this writer adopts the analysis of the *Hardacre* and *Jass* cases and rejects that of cases like *Barr* and *Alexander*. "Projected" disposable income is not "current" disposable income, despite the heroic efforts of some of my esteemed colleagues who reach the opposite result as a matter of case authority that binds them, or by means of careful sentence-parsing or of perceived legislative intentions. (My disagreement does not diminish my respect for those courts and their analyses.)

Whether a Chapter 13 debtor currently spends all the way up to the Form 22C allowances or does not do so, a Chapter 13 filing that proposes to discharge any portion of unsecured debt is <u>always</u> a choice, and is <u>always</u> about choices for the next few years.

Some of those choices are "proper" or "worthy" under <u>anyone's</u> set of moral values, such as saving a modest house from foreclosure because a basic rental unit that would safely house the debtor's family would be more expensive than curing mortgage defaults and maintaining ongoing mortgage payments.[4]

Other choices might not be "proper" or "worthy" under <u>someone's</u> set of moral values, such as saving a $10,000 Harley Davidson motorcycle that is the pride and joy of the debtor's life.

Sometimes the Court says "No, that choice is not fair to your creditors. It is not 'necessary' or 'reasonable.' It simply asks for too many advantages from the Chapter 13 process

---

[4] Many of this Court's Chapter 13 debtors earn less than $20,000/year and seek to save a house worth, perhaps, $30,000 at best, with total housing payments of $500 per month, because a comparable rental unit would cost $900 per month.

at your creditors' expense," and therefore is not a 'good faith' Plan." This writer has sometimes said, "Give up the Harley Davidson and increase your payment to your credit card debts and to your old rent defaults to your previous landlady and then you can have a Plan confirmed that will discharge the rest."

The difference between "current" and "projected" is not rocket science, particularly given that the difference is to be informed, in this writer's view, by the "good faith" test. But it is value-laden, and subjective.

In the present case, what the Debtors choose to do rather than to pay their debts in full is to live humbly for the next five years and build a bank account for the future, while discharging 61% of their credit card debt. Is that choice a difference that BAPCPA ennobles, given that debtors who live in a more expensive house with a larger mortgage, and who, consequently, have Schedules I and J that show no excess income over the Form 22C formulation of "current monthly income," readily enjoy confirmation of their 61% - discharge Plans?

This is not an easy question unless the *Barr* and *Alexander* cases are correct. If they are, then the Form 22C computation is the *alpha* and the *omega*. Otherwise, the question requires that one plumb the debts of one's own, personal, value judgments. Once one does so, and then emerges from the depths, and decompresses along the way, and stands again in the daylight of the fact that no Bankruptcy Court can possibly "know the soul" of a party who stands before the Bench, the question becomes easier. Easier, but not intellectually satisfying. The result is the disquieting comprehension of just how much the product of a successful Chapter 13

program is "rough justice."  (In this context, "rough justice" means making justice work in a vast nationwide program that pumps hundreds of millions of dollars (if not billions) back into the economy, and genuinely helps a lot of people, but does not necessarily accomplish each goal in every single case.)  That rough justice, to this writer, is the law of Chapter 13, even after BAPCPA.

There is facial appeal to the notion that a debtor who chooses not to spend as much on a house or car as another debtor of comparable income should not have to pay more to unsecured creditors that than other debtor.  That other debtor is permitted to use income to build equity in a more expensive home, perhaps, so why should not the debtor who is not driven by the acquisition of "things" be permitted to build a bank account?

First we must look at BAPCPA.  BAPCPA displaced the earlier view that "projected disposable income" is indistinguishable from what, in common parlance, is "excess post-petition income."[5]  When Schedules I and J were the primary source of data, the two terms were synonymous.  An expense item that was not "necessary" was "excess" or "discretionary" or a "luxury."  Therefore, a debtor could not reduce the payout to unsecured creditors in order to support the debt on a nice $10,000 sailboat that the debtor enjoys racing in a fleet on summer evenings off Buffalo on Lake Erie.  Even if the "good faith" test would not require surrender of the sailboat to repossession (or instead a tightening up of other expenses to offset the boat

---

[5]But see Conrad K. Cyr, *The Chapter 13 "Good Faith" Tempest: An Analysis and Proposal for Change,* 55 Am. Bankr. L.J. 271 (1981).  It would appear that as of 1981, Judge Cyr (then an eminent Bankruptcy Judge and now an eminent Circuit Judge) believed that adoption of the 1984 "projected disposable income test" should lay to rest such questions as that now at Bar.

payments), then "<u>projected</u> disposable income" would so require, prior to BAPCPA. Has BAPCPA changed this result by defining "disposable income" in such a way as to turn many "<u>discretionary</u>" <u>expenses</u> into "<u>non</u>-disposable <u>income</u>." There is no doubt that BAPCPA does permit the boat <u>payments</u> to be excluded from what otherwise might be found to be a debtor's "current disposable income."[6] But to equate that result with the statutory phrase "<u>projected</u> disposable income," as some courts do, would yield an "absurd" result.[7] Such a result would not be absurd if Congress, by clear legislation, were to codify it; the policy underpinning of unequivocal legislation that provides a clear result for application by the Courts is none of the Court's business. But this writer disagrees with those Courts that have held that Congress has already addressed this question and has, in BAPCPA, commanded this absurd result.

   Pursuit of a growing bank account is certainly more highly recommended than pursuit of a finer house or car, but it is still "discretionary" if one is seeking to do so while seeking to discharge unsecured debt in bankruptcy (or even to stretch the debt repayment out beyond the stated terms). But Chapter 13 recognizes a vast panoply of forces that shape various debtors' lifestyles and life choices. Bankruptcy courts do not properly sit in moral judgment of how debtors of comparable income prioritize their lifestyles, and consequently prioritize their expenses, <u>within the same income bracket</u>. So why should not a Bankruptcy Court apply a moral

---

[6] Line 47 of Form B22C is found in Subpart C: Deductions for Debt Payment. The instruction state in pertinent part: For each of your debts that is secured by an interest in property that you own, list the name of the creditor, identify the property securing the debt, and state the Average Monthly Payment. Those payments are then <u>deducted</u> from "current disposable income."

[7] "Absurd" is not used here as a pejorative, but rather as the elusive legal standard that permits departure from a statute's "plain language" in favor of examination of legislative intent. No such departure is needed here.

judgment that equates one debtor's decision not to spend on "things" and to put the excess in the bank, with other debtors' decision to spend more of his or her income on a house or car when both are attempting to discharge the same amount of debt?

The first part of the answer lies in the fact that although it is glib to say that building a bank account is a more worthy choice than living in a nice neighborhood, it is not necessarily accurate to say so. A high quality public school system for a debtor's children to attend, and the consequent higher housing costs (often),[8] is no <u>less</u> worthy than a savings account for a couple who are free of such a concern.

More nuanced than that distinction are choices that turn on ethnicity, national origin, and other intangibles. Bankruptcy Courts do not have ethnologists, sociologists, and other experts on staff to help Bankruptcy Judges understand why, for example, a given debtor "needs" (rather than merely "wants") <u>this</u> vehicle or <u>that</u> address to fulfill heart-felt ties with her culture, or family, or ethnicity, or Parish. And so it is not unfair to ask why the Debtors at bar "need" (rather than merely "want") a growing bank account, just as we often ask other debtors why they "need" such an expensive house.

Indeed, if we look at the <u>income</u> side of the cases that we see, we find very many Chapter 13 debtors who are <u>underemployed</u>, by choice. They could earn more. But until Congress tells this writer to deny confirmation of the Chapter 13 plan of a husband and wife if one or the other stays home to raise the children, this writer will not do so even though countless

---

[8] See Elizabeth Warren and Amelia Warren Tyagi, "The Two-Income Trap: Why Middle-Class Mothers and Fathers Are Going Broke" (2003).

other parents who owe money, reluctantly choose not to stay home with their children, and instead choose to work to pay bills either within or without Chapter 13.[9]

Again, to sit as a Chapter 13 Judge against the background of the panoply of the forces that shape debtors' choices does not permit the Judge to substitute his or her value judgments for those of the debtor. Instead, such judges do "rough justice," and need every statutory tool at their disposal to achieve it on a program-wide basis, though they might not achieve justice in every case. Congress' retention of the "good faith" test, and the presence of the word "projected," modifying the phrase "disposable income," are the key tools. BAPCPA did not take those away.

We are left, still, with the overarching question of why, if all of the above is so, these Debtors' choice to "bank" their excess disposable income must fall, when other debtors' choice to use such income to donate more to their church or to build equity in a more valuable home or to drive nicer cars is permitted, <u>within</u> <u>reason</u>, at the expense of their unsecured creditors. Set the Harley Davidson motorcycle and the racing sailboat aside. Set all luxury items aside - - mortgage payments or instalment payments on a vacation timeshare, recreational motor home, campsite or hunting compound, or carrying costs on a piece of real estate that could produce income, but instead is being occupied by non-dependent family or friends free of charge; or educational loan assistance to non-dependent adult children, and countless other

---

[9]This moral-value-laden dichotomy is only the tip of the iceberg. A very significant percentage of Chapter 13 debtors here live in "alternative" family units: e.g. unmarried couples with children who are not legal dependents, or where one is the caretaker of the other. Such cases are a major "cross section" of the iceberg, somewhere along the water line. Congress surely knew of such things when it enacted BAPCPA, and the President surely knew of these things when he concurred with Congress' result.

"luxuries," the cost of which this Court sees in Chapter 13 cases every day and does <u>not</u> permit be visited upon the Debtors' unsecured creditors.[10]

The focus instead must be on a comparison between <u>these</u> Debtors and debtors whose choice to live in a community with a better public school system, at higher cost, is a "proper" and "worthy" choice under anyone's system of values and moral judgments. Perhaps these Debtors' choice is also as proper and worthy.

And so the second part of the answer requires that we address the matter of "community standards." In this writer's view, the only valid legal debate that BAPCPA's language spawned as regards above-median-income Chapter 13 debtors is whether BAPCPA's linkage to state averages, and (in some instances) county averages, has barred arguments by Trustees and creditors regarding "community standards" as an operative factor. Not only as such standards apply to any given case, but as they apply to the success of the Chapter 13 program throughout a given judicial district or division.

There are many factors <u>other than frugality</u> that may place debtors into the 39% CMI result; i.e. a discharge of 61%. Most common is the use of unsecured credit to make a sizeable down-payment on a house or car or motorcycle, leaving sizeable secured debt that Form 22C excludes from CMI. Also found are generous parents, - - for example, the debtor who works for a family business that pays her just enough to save a car and a house and get a Chapter 13 discharge, but not enough to pay debts in full. Also found (particularly in this locality) is an

---

[10] See *In re Wm. A & Barbara Godios*, Case No. 05-13488 (Bankr. W.D.N.Y. Nov. 4, 2005) September 5, 2005, regarding tuition, etc. as "discretionary expenses."

Case 1-05-70085-MJK    Doc 35    Filed 09/19/06    Entered 09/19/06 16:23:30    Desc Main
Document      Page 10 of 14

"inherited" house, perhaps once free-and-clear, but now mortgaged to support fine cars and vacations, or other luxuries.

Contrary to some other authority, this writer finds that BAPCPA does not command that there be no inquiry into such matters. Not just "good faith" is still required, but "projected" is still a meaningful word. Indeed, "<u>projected</u>" <u>may necessitate immediate change</u>, if the debtor is to win Confirmation.

In one case, for example (a pre-BAPCPA case), this Court demanded inquiry into why the family business "demoted" the debtor from ownership and management to a sales position in advance of his Chapter 13 filing, dramatically reducing his pay. That case was then withdrawn. (As to the right to withdraw, See *Barbieri v. RAJ Acquisition Corp., (In re Barbieri)*, 199 F.3d 616 (2d Cir. 1999). In another pre-BAPCPA case, the debtor's sole source of income was his work as caretaker of his frail father who lived next door. When the Court asked to see <u>his</u> <u>father's</u> tax return, and found tens of thousands of dollars declared in <u>interest</u> income, and when the Court consequently asked why the debtor could not get enough income from his father to make a substantial repayment to his creditors, that case too was withdrawn.

Such tales abound.

If BAPCPA intended that such inquiries cease, then the "good faith" requirement and the word "projected" would have been repealed. They were not.

Along similar lines are cases in which substantial payments on secured debt are being made in order to preserve a <u>luxury</u> item, such as a classic car or motorcycle, or a timeshare, or other vacation property. Even BAPCPA continues to reference "amounts

reasonably expended . . . ."  Consequently, the word "projected" cannot be meaningless <u>given that</u> the Form 22C computation <u>does not discern</u> between secured debts for <u>necessities</u> and secured debts for <u>luxuries</u>.  Rather, "Projected disposable income," properly applied, often requires surrender of those luxuries to repossession or foreclosure, if confirmation of a less-than-100% Plan is to be won.

       Whether it is the application of the word "projected" alone or the application of the "good faith" requirement alone that requires such a result is of no practical moment.  The flaw in the reasoning of the Courts in the cases to the contrary is in the failure to recognize the profound truth that Chapter 13 always was, and still remains, "rough justice."  There is no precision in it, and there never was.  Any effort to parse its components and reconcile them is, and always was, doomed to failure.[11]  In any District in which Chapter 13 is successful, it is a Chapter 13 <u>program</u>, with individual successes in <u>most</u> cases and <u>failures</u> of true "justice" in some individual cases.

       And now the last part to the answer.  There are practical limits to the Court's ability to inquire into such matters.  We simply cannot (as noted above) look into the soul of every debtor and decide whether what she wants to preserve is a "need" or just a "want."  At some point we must assume that the best judge of what a Chapter 13 debtor "needs" is the debtor.  We cannot "walk a mile" in every debtor's shoes.

       Finally, then, to this writer, the <u>Trustee</u> is the voice of the community, and that

---

[11] This writer has studied it for over 30 years, and has also sat at the knee of some of its foremost proponents.

fact is why he or she is the "representative of the estate." The "need" (if it is such) for these Debtors to build a bank account while discharging 61% of the unsecured debts that he or they incurred is offensive to the Chapter 13 Trustee here, as the representative of the creditor community that he and the Court serve. The Trustee argues that people who owe money and have the "excess" income to pay it, do so in this community. This Trustee has served in his role here for more than 25 years. He presides at the § 341 meetings at which the creditor community is heard. He has done this job very well, sending almost $25 million out to creditors this year. He is no zealot and he knows the debtor community and creditor community better than this writer. He is not a mere cipher or bureaucrat throwing issues to the Court for deliberation without care.

The Trustee argues that people who owe money, but have no "excess" because they spend more within reason, are not presumed in this community to have exceeded their reasonable needs, though in Chapter 13 cases he and the Court examine the *bona fides*. What the current Debtors seek to "bank," they do not "need," in his view.

And so the Court defers to his recommendation in this case.

This is, as noted above, a disquieting and professionally-unsatisfying result for a Judge. It is "rough justice," but is, to this writer, the law, even after BAPCPA. But this is what a Standing Trustee is for, and this Court's Standing Trustee is deservedly respected.

This writer will continue to examine each case on its own merits, using the "good faith" test and the flexibility of the term "projected" disposable income to inform the Court's

evaluation of the Form 22C calculation of CMI, at the time of confirmation, and only considering the Trustee's recommendation. Whether this holding will work for or against a debtor in relation to Form 22C is a function of the facts of that debtor's case. Here, the 100% "promise" is required, subject to later modification, if warranted.

        SO ORDERED.

Dated:        Buffalo, New York
                September 19, 2006

        s/ Michael J. Kaplan
        _____
        U.S.B.J.